# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

NATASHA D.,[1]

                                 Plaintiff,

      v.                                    3:19-CV-515
                                             (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

ELIZABETH V. KRUPAR, for Plaintiff
AMELIA STEWART, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

Plaintiff protectively[2] filed her application for Supplemental Security Income

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("SSI") benefits on October 15, 2015, originally claiming disability beginning in August of 2009.[3] (Administrative Transcript ("T") at 10). The application was denied initially on February 8, 2016. (T. 127-33). Plaintiff made a timely request for a hearing, which was held on February 8, 2018 before Administrative Law Judge ("ALJ") Bruce Fein. (T. 92-116). Plaintiff appeared with her representative and testified at the hearing. (*Id.*) ALJ Fein issued an unfavorable decision on April 5, 2018. (T. 10-23). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on March 18, 2019. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

---

[3] Plaintiff later amended her onset date to October 19, 2015 to coincide with her SSI application.

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.

2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff was born on September 18, 1991, making her 24 years old at her amended onset date and 26 at the time of the ALJ's hearing. (T. 97). Plaintiff testified that she lived in a home with her husband and her six-year-old daughter. (T. 96-97).

Plaintiff knew how to drive, but did not do so because she had a hard time lifting her right foot from the accelerator to the brake. (T. 97). Plaintiff graduated from high school and testified that she completed approximately two years of college level study. (T. 97-98). Plaintiff stated that she tried taking online college courses twice, but was "kicked out" both times. (T. 98-99). Plaintiff testified that she started out doing well, but failed because she had trouble sitting and could not stay focused. (T. 99).

Plaintiff had past work experience in 2010 and 2011 when she worked as a cashier and stocked shelves at a gas station. (T. 114). Plaintiff testified that she worked with Acces-VR[4] for approximately one year[5] in an attempt to find a secretarial job, but had not found anything yet. (T. 99-100). However, plaintiff stated that she did not think she could do a secretarial job because she had to elevate her leg and suffered Fibromyalgia pain.[6] (T. 100). Plaintiff then testified that she would need to find a job which would allow her to sit and stand as needed. However, when the ALJ asked whether plaintiff thought she could perform such a job, she said that she did not know. (T. 100-101). Plaintiff stated that when elevated, her right leg needed to be at heart level, and she needed to wear compression stockings. (T. 101). Plaintiff stated that she had "fibro blood clots" from her hip to her toes that had not yet "dissolved." (T. 102).

---

[4] Acces-VR stands for Adult Career and Continuing Education Services-Vocational Rehabilitation. It is part of the New York State Department of Education and assists individuals with disabilities to achieve and maintain employment by offering services in training, education, rehabilitation, and career development. www.acces.nysed.gov/vr.

[5] Plaintiff stated that she began working with this agency "sometime in 2017." (T. 100).

[6] Plaintiff testified that her nurse practitioner diagnosed the Fibromyalgia. (T. 102-103).

Plaintiff also stated that she took Gabapentin[7] for her Fibromyalgia. Plaintiff testified that she could only stand for five minutes, then her legs would "fill up," and she would feel pain. (T. 106). She could only walk "a couple hundred feet" before she became short of breath and suffered from chest pain.[8] (*Id.*)

Although plaintiff testified that deep vein thrombosis[9] ("DVT") was her "primary" problem, she also had some mental health conditions. (T. 104). The ALJ asked plaintiff what symptoms she had from her Post Traumatic Stress Syndrome ("PTSD"), but instead of answering the question, plaintiff stated that she dealt with depression "every day." (T. 105). The ALJ then changed the subject to plaintiff's depression, and never returned to discussing the alleged symptoms of PTSD. (T. 105-106). Plaintiff testified that she was seeing a counselor once per week, who was giving her "therapy" to help with her problems and to "be able to tough stuff out." (T. 107).

Plaintiff discussed her daily activities. (T. 107-108). She testified that she got up in the morning, got her daughter ready to go to school, and took her to the bus stop if her husband was not around to do it. (T. 107). Plaintiff then ate breakfast and started cleaning the house, doing dishes, sweeping the floor, mopping, vacuuming, and doing laundry. (T. 107). Plaintiff stated that she took several breaks during the day. (T. 108).

---

[7] Gabapentin is an anti-epileptic drug that is often prescribed for adults with fibromyalgia pain. "Gabapentin for Chronic Neuropathic Pain and Fibromyalgia in Adults," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4171034/

[8] Plaintiff stated that, on an unspecified date, she visited the emergency room because of chest pain, but she was told that the pain was related to "anxiety." (T. 107).

[9] DVT occurs when a blood clot forms in a deep vein, usually in the lower leg, thigh, or pelvis, but can occur in the arm. www.cdc.gov/ncbddd/dvt/facts.html. A pulmonary embolism occurs when a part of the clot breaks off, traveling to the lungs and causing a blockage. *Id.*

Plaintiff stated that she worked at a particular chore for approximately 15-20 minutes, then took a 5-10 minute break during which she sat down. (T. 108).  The ALJ asked plaintiff "[a]re there any things that you need help with that you can't do?"  Plaintiff responded "[n]ot really." (*Id.*)  Plaintiff testified that she sometimes cooked, but her husband shopped for the groceries. (*Id.*)

Plaintiff testified that she took her daughter to "Girl Scouts" and watched her with the other children. (T. 109).  Plaintiff testified that she did not participate in any school or Girl Scout activities, other than helping her daughter sell Girl Scout Cookies by calling people she knew who might be interested in buying the cookies. (*Id.*) Plaintiff said that she was "looking forward to it" in the first week of March. (T. 110). Plaintiff testified that she drove "a couple" times per month. (T. 111).  She stated that she drove to see her mother, drove to Girl Scout meetings for her daughter, and to church, all of which were approximately 15 miles from her home. (*Id.*)

Plaintiff testified that, in addition to being limited by the DVT, she had trouble sitting because of Fibromyalgia pain. (T. 111).  She stated that the pain was throughout all her muscles and joints, "every one of them." (T. 111-12).  Plaintiff testified that she could sit for approximately half an hour before the pain in her leg would force her to stand.[10] (T. 112).  The plaintiff stated that her most "problematic" pain was in her right leg, and that it did not matter whether or not the leg had been elevated and whether or not plaintiff was wearing her compression stockings. (*Id.*)

Plaintiff testified that she could only lift 10 pounds because she was still

---

[10] The ALJ asked plaintiff to specify what exactly would require her to stand after half an hour. (T. 112).  He asked "where are you having pain that says hey I have to sit up or stand after sitting." (*Id.*)

experiencing pain and swelling in her right arm from "previous DVTs," and her doctor told her to limit her lifting. (T. 113). While she conceded that there was "nothing" wrong with her left arm, she told the ALJ that she could not lift "a lot" with the left arm either. (*Id.*) Plaintiff was taking Xarelto for the DVT, after Coumadin failed to work for her.[11] (T. 101-102). Plaintiff was also taking Levothyroxine[12] for her thyroid issues. (T. 102).

There are a substantial number of medical records. Rather than summarizing the records at the outset, I will refer to the pertinent records during my discussion of the plaintiff's arguments.

## IV.  THE ALJ'S DECISION

After finding that plaintiff had not engaged in substantial gainful activity since her amended onset date, the ALJ found that plaintiff had two severe impairments: DVT and generalized anxiety disorder. (T. 12). The ALJ found that plaintiff's hypertension, hypothyroidism, vitamin D deficiency, obesity, and borderline personality disorder were not severe. (T. 12). The ALJ also noted that, although plaintiff "may" have bipolar disorder and "has alleged" having PTSD, none of these impairments were severe because they had not "more than minimally" affected her ability to perform work activities. (T. 12-13). Finally, the ALJ found that, although plaintiff alleged that she had fibromyalgia, the medical evidence did not show the "criteria that must be present

[11] Coumadin and Xarelto are anticoagulant medications. www.xarelto.com; www.coumadinbmscustomerconnect.com

[12] Levothyroxine is used to treat hypothyroidism (low thyroid hormone). www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/description/drg-20072133.

to permit a diagnosis of fibromyalgia." (T. 12-13). Thus, the ALJ found that fibromyalgia was not a medically determinable impairment. (T. 13).

After pointing out that there were no Listings for DVT and obesity, at step three of the sequential evaluation, the ALJ found that neither of plaintiff's severe impairments, alone or in combination, met or equaled the severity of a Listed Impairment.[13] (T. 13-15). At step four, the ALJ found that plaintiff had the RFC to perform "less than sedentary work as defined in 20 C.F.R. § 416.967(a)." (T. 15). Specifically, the ALJ found that plaintiff could frequently lift and/or carry 10 pounds and occasionally lift and/or carry 20 pounds. (T. 15). Plaintiff could sit for 6 hours in an 8-hour day with normal breaks and could stand and/or walk for 2 hours in an 8-hour day, with normal breaks. (*Id.*) The ALJ also found that plaintiff could engage in all postural activities, but could only "occasionally" climb ropes, ladders, and scaffolds. (*Id.*) Mentally, plaintiff could perform "low stress work," which is defined as work involving only "occasional decision-making, changes in the work setting, and judgment required." (*Id.*)

In making this RFC determination, the ALJ stated that he considered all of the plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence" based on the requirements of 20 C.F.R. § 416.929 and Social Security Ruling ("SSR") 16-3p

---

[13] The Listing analysis was confined to plaintiff's mental impairments because there were no listings for DVT and obesity. The ALJ considered Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse control disorders), and 12.15 (trauma and stressor-related disorders). The ALJ considered all of plaintiff's alleged mental disorders in his analysis, even the ones that he found to be non-severe.

(T. 15).  The ALJ considered medical opinion evidence, plaintiff's daily activities, and other evidence in the record. (*Id.*)

The ALJ found that, based on plaintiff's RFC, she could not perform her past relevant work. (T. 21).  The ALJ then determined that if plaintiff could do the full range of sedentary work, the Medical-Vocational Guidelines ("the Grids") would "direct" a finding of not disabled. (T. 22).  The ALJ found that plaintiff's additional limitations would have "little or no effect on the occupational base of unskilled sedentary work." (*Id.*)  In making this finding, the ALJ specifically considered any mental limitations that plaintiff would have. (*Id.*)  In accordance with SSR 85-15, the ALJ found that as long as plaintiff could perform the basic mental demands of competitive, remunerative, unskilled work, she would not be "disabled." (*Id.*)  The ALJ found that plaintiff had no significant limitations in the ability to perform these "basic mental demands." (*Id.*)  Based on this finding, the ALJ used the Grids to determine that plaintiff was not disabled. (*Id.*)

## V.  <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.  The ALJ improperly weighed the evidence.  (Plaintiff's Brief ("Pl.'s Br.") at 10-18) (Dkt. No. 9).

2.  The ALJ erred in finding that plaintiff's testimony was inconsistent with the evidence of record.  (*Id.* at 18-20).

3.  The ALJ erred at Step 5 in relying solely on the Grids. (Pl.'s Br. at 21-22).

Defendant argues that the ALJ properly evaluated the medical evidence of record, and

his decision is supported by substantial evidence. (Defendant's Brief ("Def's Br.") at 4-16) (Dkt. No. 11). For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## VI.   RFC/WEIGHING EVIDENCE

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019);

*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Weighing Evidence

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The

ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B. Application

Plaintiff argues that the ALJ did not give appropriate weight to the Medical Source Statement ("MSS") of plaintiff's treating primary care nurse practitioner, Hannah Doscher, FNP; and to the consultative opinion by Gilbert Jenouri, M.D. Plaintiff also argues that the ALJ failed to explain the weight that he afforded to the reports of two acceptable medical sources: Dr. Sara Long, Ph.D. (a consultative physician) and Dr. Oliver Fassler (a State Agency Review Physician).

On August 28, 2017, FNP Doscher completed a physical MSS, in which she stated that she had treated plaintiff for two years for a variety of physical and mental impairments. (T. 544-47). FNP Doscher found that plaintiff could sit "at least" 6 hours and stand and walk less than 2 hours in an 8-hour day, with normal breaks. (T. 545). She found that plaintiff could sit for 2 hours at a time and stand for 15 minutes at a time, but could walk less than one block without "rest or severe pain,"[14] and she would need a job in which she could shift positions at will from sitting, to standing, or walking. (*Id.*) She would need to walk for 5 minutes every hour and would need to take

---

[14] This question on the MSS form is very unclear, as is FNP Doscher's answer. The question is "How many city blocks can your patient walk without ***rest or severe pain***?" (T. 545) (emphasis added). FNP Doscher's response was "< 1 block." However, there is no indication of whether this amount of walking will result in "severe pain," or whether plaintiff will just need to rest. There is a substantial difference between the two choices, and FNP Doscher does not clarify her answer.

unscheduled breaks 3 times per day for 5 minutes each time. (*Id.*) With prolonged sitting, the plaintiff would have to elevate her legs above her heart for 25% of the work day to minimize the swelling. (T. 546).

FNP Doscher found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. (*Id.*) She could frequently twist, occasionally stoop and climb stairs, rarely crouch, and never climb ladders. (*Id.*) She had no significant limitations reaching, handling, or fingering. FNP Doscher also found that plaintiff would be "off task" 25% of the work day, when her symptoms would likely be severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (T. 547). FNP Doscher did state that plaintiff would be capable of "low stress" work. (*Id.*) FNP Doscher also opined that plaintiff's condition would not "produce 'good days' and 'bad days.'" (*Id.*) On December 22, 2017, FNP Doscher wrote a letter "to whom it may concern," stating that plaintiff's restrictions remained the same as those FNP Doscher expressed in the August 28, 2017 MSS. (T. 792).

The ALJ considered FNP Doscher's MSS, together with her treatment notes and gave the MSS "[s]ome evidentiary weight due to the treatment relationship," but stated that FNP Doscher was not a "recognized medical source" for purposes of Social Security. (T. 17-18). While the ALJ accepted some parts of the report, he specifically rejected FNP Doscher's assessment that plaintiff would be "off task" for 25% of the workday "in the total absence of any testing that supports this opinion." (T. 18). The ALJ further stated that his finding that plaintiff could perform sedentary work was based primarily on FNP Doscher's assessment and plaintiff's "statements that show at

least that ability." (*Id.*)

As a threshold matter, plaintiff concedes that FNP Doscher was not an "acceptable medical source," thus her opinion was not entitled to controlling weight. For claims filed prior to March 27, 2017, the Social Security Administration categorized nurse practitioners as "other medical sources," whose opinion may be considered as to the severity of a claimant's impairment and ability to work, but who are not necessarily entitled to the weight afforded to a treating physician. 20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1).[15]  The regulations direct an ALJ to use various factors in evaluating the opinions of these "other medical sources," including frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise. 20 C.F.R. §§ 404.1527(c) and (f), 416.927(c) and (f).[16]  The Second Circuit has stated that "'the ALJ has discretion to determine the appropriate weight to accord [the other source's] opinion based on all the evidence before him." *House v. Comm'r of Soc. Sec.*, 32 F.

---

[15] The current version of these regulations (applicable to cases filed after March 27, 2017) no longer differentiates between "acceptable" and "other" medical sources.  The sections are entitled "Categories of Evidence," and defines the differences between objective medical evidence, medical opinion, "other medical evidence," and evidence from non-medical sources.  The evaluation of opinion evidence for claims filed prior to March 27, 2017 is now located at 20 C.F.R. § 404.1527 and 416.927 and does refer to acceptable versus other sources.  In this case, plaintiff filed her claim prior to March 27, 2017.

[16] The new regulations now contain separate sections for claims filed prior to, and after, March 27, 2017.  As stated above, sections 404.1527 and 416.927 contain the regulations for cases filed prior to March 27, 2017.  In sections 404.1527(f)(1) and 416.927(f)(1), the regulations refer to 404.1527(c)(1)-(c)(6) and 416.927(c)(1)-(c)(6) which contain the specific factors by which the Commissioner evaluates "acceptable medical sources," but states that "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." *Id.*

Supp. 3d 138, 151 (N.D.N.Y. 2012) (quoting *Diaz v. Shalala,* 59 F. 3d 307, 313–14 (2d Cir. 1995)) (some alterations in original).

While recognizing that the ALJ is entitled to give weight to some parts of a medical opinion, but not others, the plaintiff accuses ALJ Fein of improperly "cherry picking" and failing to give good reasons for the conclusions he made based on FNP Doscher's report. (Pl.'s Br. at 11-13). An ALJ may accept some portions of medical opinions, while rejecting others, "[b]ut, when doing so smacks of 'cherry picking' of evidence supporting a finding while rejecting contrary evidence from the same source, an [ALJ] must have a sound reason for weighting portions of the same-source opinions differently." *Cromwell v. Comm'r of Soc. Sec.*, No. 18-CV-1194, 2020 WL 409989, at *3 (W.D.N.Y. Jan. 24, 2020) (quoting *Younes v. Colvin*, No. 1:14-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 02, 2015) (alterations in original)).

In this case, ALJ Fein gave FNP Doscher's MSS "some" weight and used most of the information in that report, together with other evidence in the record, to determine that plaintiff could perform sedentary work. At the same time, the ALJ rejected FNP Doscher's determination that plaintiff would be "off-task" for 25% of the workday and would need to alter her positions more frequently than allowed in a full range of sedentary work.

In accordance with the above-cited regulations, the ALJ recognized the frequency of treatment and analyzed the consistency of the opinion with other evidence, and the "thoroughness of the explanation." (T. 18). In that regard, the ALJ is correct that there is no indication how FNP Doscher made her assessment about the percentage

of plaintiff's "off task" time or how she determined when plaintiff would need to change positions. A review of FNP Doscher's treatment notes show that she rarely, if ever, performed any kind of a musculoskeletal evaluation, and did not even examine plaintiff on the day that FNP Doscher completed the MSS.[17] (T. 852). On November 16, 2016, plaintiff presented for a follow-up of her "chronic medical conditions." (T. 830). Plaintiff noted that the medication she was taking for fibromyalgia[18] was working, and that she was going to physical therapy and seeing improvement. (*Id.*) On May 11, 2017, FNP Doscher noted that plaintiff "denied" "joint pain, myalgia, and gait disturbance."[19] (T. 846). FNP Doscher's physical examination on May 11, 2017 did not even include a reference to musculoskeletal issues. (*Id.*)

The ALJ also considered plaintiff's daily activities in making his RFC determination and in rejecting the 25% off-task assessment by FNP Doscher. (T. 18). Under the regulations, plaintiff's daily activities are a factor the ALJ may properly

---

[17] The report specifically states that "Review of Symptoms" was "not assessed," and "No physical exam done." (T. 852). Plaintiff visited FNP Doscher on August 28, 2017 solely for purposes of completing her disability forms. (T. 848). In February of 2017, FNP Doscher noted in plaintiff's "past medical history" that her last DVT was in 2012. (T. 836).

[18] As stated above, the ALJ found that fibromyalgia was not a medically determinable impairment. (T. 12-13). Although on May 27, 2016, a nurse practitioner stated in her progress notes that plaintiff "met" the 2010 diagnostic tests for fibromyalgia, she also stated that her depression and other medical conditions could be "contributing," and that the pain in her neck and shoulder could be caused by obesity and poor posture. (T. 658). The nurse practitioner then stated that plaintiff should return in six months or sooner for fibromyalgia "if a diagnosis is made." (*Id.*) It appears that the nurse practitioner did not actually make a diagnosis of fibromyalgia, even assuming that she was entitled to do so, and even though the diagnosis began to appear on plaintiff's medical records. In June of 2016, Dr. Shelby Cooper, M.D., who plaintiff saw in 2016 for a follow-up of her DVT, stated in her treatment note that plaintiff "states she has fibromyalgia also." (T. 616). The parties do not appear to question the ALJ's finding in this regard.

[19] Plaintiff told FNP Doscher on May 11, 2017 that she needed a form completed so that she could get a tutor for school because she was having trouble with reading comprehension. (T. 844).

consider. 20 C.F.R. § 416.929(c)(3). *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ properly considered the plaintiff's varied daily activities in formulating the RFC); *Herrington v. Berryhill*, No. 3:18-CV-315, 2019 WL 1091385, at *7 (D. Conn. Mar. 8, 2019) (activities of daily living, including childcare, are appropriate factors for an ALJ to consider when assessing a plaintiff's claimed symptoms and limitations).

In this case, the ALJ discussed a function report that plaintiff submitted on November 20, 2015 in connection with her application in addition to her hearing testimony. (T. 16-18). Plaintiff's daily activities included making breakfast for her daughter, getting her ready for, and taking her to the bus stop. (T. 107). Plaintiff also stated that she took her daughter to her Girl Scout meetings, although she did not participate in the activities. Plaintiff testified that she did a variety of household chores, including cleaning the house, doing the dishes, mopping the floor, vacuuming, and laundry. (T. 107). She testified that she took several breaks while performing these tasks and did each activity for 15-20 minutes before resting for 5 minutes. (T. 107-108). The plaintiff sat down to rest. However, she also testified that she did not need help doing anything. (T. 108). Plaintiff helped her daughter sell Girl Scout Cookies by calling people on the telephone who might be interested in purchasing them. (T. 108-109).

"Cherry picking" can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both. *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010). In this case, plaintiff argues that the ALJ engaged in "cherry-picking" when he rejected FNP Doscher's assessment that plaintiff would be

off-task 25% of the work day, or that she would have to change positions more frequently than allowed in a full range of sedentary work. However, plaintiff does not point to any aspect of FNP Doscher's treatment notes that would in any way support this statement, and in fact, has not pointed to any statements in FNP Doscher's progress notes that are inconsistent with a finding that plaintiff could perform sedentary work. FNP Doscher found that plaintiff could sit "at least" six hours in an 8-hour day and could lift more than the weight required for sedentary work. In fact, as discussed below, the medical evidence from other providers in the record also supports the ALJ's finding. Thus, the ALJ did not engage in "cherry-picking," and he properly supported his reasons for failing to give weight to portions of FNP Doscher's report.

Plaintiff also argues that the ALJ failed to properly weigh the opinion of consulting physician Dr. Gilbert Jenouri, M.D., who examined plaintiff on December 18, 2015. (Pl.'s Br. at 13-15; (T. 532-35). Plaintiff argues that the ALJ failed to incorporate some of Dr. Jenouri's postural limitations into the RFC, including a mild limitation for bending and stair climbing, squatting to 75%, and positive straight-leg raising ("SLR") on one side.

The ALJ discussed Dr. Jenouri's opinion at length. (T. 17). The ALJ specifically mentioned Dr. Jenouri's findings regarding the limitation on plaintiff's ability to squat in addition to her positive SLR on the right side. (T. 17). Dr. Jenouri conducted a musculoskeletal examination and determined that plaintiff had some range of motion limitations, but full ranges of motion in her cervical spine, knees, ankles, shoulders, elbows, forearms, and wrists. (T. 534). She had full strength in her upper and lower

extremities. (*Id.*) Notwithstanding plaintiff's limitations, Dr. Jenouri ultimately found that plaintiff had only "mild restrictions" for walking, standing, sitting for long periods, bending, climbing stairs, lifting and carrying. (T. 535).

The ALJ noted that the opinion was "vague," but it was not inconsistent with a finding that plaintiff could perform sedentary work. (T. 17). The ALJ stated that he was giving Dr. Jenouri's opinion "some evidentiary weight because the doctor had programmatic expertise and examined the plaintiff.

Contrary to plaintiff's argument, the ALJ did not "ignore" Dr. Jenouri's restrictions, rather the ALJ found that the limitations cited by Dr. Jenouri were not inconsistent with sedentary work. "Mild" limitations on these work-related functions are consistent with a finding that a plaintiff can perform sedentary work. *See Bullis v. Comm'r of Soc. Sec.*, No. 3:14-CV-513, 2015 WL 5177733, at *7 (N.D.N.Y. Sept. 4, 2015). This is particularly true in this case, considering that FNP Doscher found that plaintiff could sit for at least 6 hours in an 8-hour day, and plaintiff's activities are consistent with this finding. In *Bullis*, the court stated that

> The very nature of sedentary work does not require a plaintiff to sit for six hours at one time, "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8–hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2–hour intervals." SSR 96–9P (S.S.A. July 2, 1996). The Second Circuit has observed, "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight."

*Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir.2004)).

Plaintiff argues that the ALJ erred in failing to incorporate Dr. Jenouri's limitations on "bending and stair climbing" into the RFC. However, SSR 96-9P states that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." SSR 96-9P, 1996 WL 374185 at *7 (July 2, 1996).

In addition, sedentary work involves the ability to "stoop" "occasionally." *Id.* "Stooping" is defined as "'bending forward *and downward* at the same time, while sometimes also bending at the knees.'" *Zito v. Comm'r of Soc. Sec.*, No. 17-CV-13255, 2019 WL 1649346, at *7 (W.D.N.Y. Apr. 17, 2019) (quoting SSR 83-14) (emphasis in original). "Occasionally is defined as "very little, up to one third of the time." SSR 96-9P, 1996 WL 374185 at *7. A "mild" limitation in the ability to bend or stoop is thus, consistent with the full range of sedentary work. The ALJ also did not "ignore" Dr. Jenouri's finding that plaintiff could only "squat" 75% or that there was positive SLR on the right side. The ALJ did not question that plaintiff had pain, and SLR is not a "postural" limitation that must be mentioned in the RFC. The ALJ took these limitations into account when making his determination. Thus, even assuming that plaintiff had all the "limitations" expressed by Dr. Jenouri, the ALJ's determination that the full range of sedentary work was not significantly eroded is supported by substantial evidence.[20]

---

[20] Finally, Dr. Jenouri's "mild" limitations on prolonged sitting are in contrast to any assertion that plaintiff would have to shift positions frequently as stated in FNP Doscher's MSS. Conflicts in the

The plaintiff also argues that the ALJ failed to explain the weight that he afforded to two acceptable medical sources, Dr. Sara Long, Ph.D. and Dr. Oliver Fassler, a State Agency Medical Consultant. (Pl.'s Br. at 16-17). Dr. Long and Dr. Fassler found that plaintiff did not have a severe mental impairment, defined as one which would interfere with her ability to function on a regular basis. (T. 120-21 - Dr. Fassler; T. 539 - Dr. Long). Although the Social Security regulations require that the ALJ "evaluate every medical opinion he receives, regardless of its source," he also "does not have to state on the record every reason justifying a decision" or "discuss every piece of evidence submitted." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). *See* 20 C.F.R. § 404.1527(c).

ALJ Fein discussed both Dr. Long's and Dr. Fassler's reports in his consideration at step three. The ALJ ultimately found that one of plaintiff alleged mental impairments was severe, thus, he did not have to specifically give weight to the reports of sources, neither of whom found that plaintiff had a severe mental impairment. However, since the ALJ did find that plaintiff had a severe mental impairment, he discussed Dr. Long's opinion at length in his analysis at step three. (T. 13). Dr. Long found that plaintiff had "no noted mental work limitations." (T. 13). As plaintiff concedes, in making his mental RFC determination, the ALJ stated that he considered the opinions of Dr. Long; plaintiff's counselor, LCSW Schultz; and plaintiff's own

---

evidence are for the ALJ to resolve in determining an RFC that is supported by substantial evidence in the record. *See Bliss v. Colvin*, No. 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such.")

admissions. (T. 14). The ALJ also discussed Dr. Fassler's report in his analysis of the Listings. (T. 13). As the state agency review physician, Dr. Fassler provided information as to whether plaintiff met the criteria for a Listed Impairment. (T. 15). The ALJ discussed plaintiff's mental limitations as stated by her own treating sources. Thus, the ALJ's failure to give specific weight to Dr. Long's and/or Dr. Fassler's reports is not error and does not require a remand.

Plaintiff also argues that the ALJ erred when he stated that the record did not contain a "formal diagnosis by a psychiatrist or psychologist." (Pl.'s Br. at 17) (citing T. 14). Plaintiff argues that this was an incorrect statement of the facts because Dr. Long is a psychologist, and she diagnosed plaintiff with a mental impairment. (Pl.'s Br. at 17). Plaintiff has misread the ALJ's decision. The ALJ made the following statement:

> The claimant has alleged symptoms of anxiety and depression, has been listed as having a bipolar 2edisorder [sic] and has alleged having been diagnosed with post traumatic stress disorder, *but the record does not contain and [sic] formal diagnosis by a psychiatrist or psychologist*, treatment having most recently been provided by Tiffany Rivenburgh, NP, a psychiatric nurse practitioner who has provided medication management, and by Malene Schultz, LCSW, a social worker, neither one of who [sic] is qualified to make these diagnoses.

(T. 13) (emphasis added). Although perhaps not very well written, the ALJ appears to be referring specifically to the PTSD diagnosis. A review of the record shows that on June 8, 2016, LCSW Schultz stated that plaintiff has "endorsed" experiencing symptoms[, and] . . . as such PTSD *will be assigned to her*." (T. 635) (emphasis added). On July 7, 2016, FNP Rivenburgh stated that plaintiff was diagnosed with PTSD "by

her therapist." (T. 636).  As stated above, neither NP Rivenburgh nor LCSW Schultz were acceptable medical sources for purposes of diagnosing an impairment.  There is no ***PTSD*** diagnosis in the record by a psychiatrist or psychologist.  Thus, with this interpretation, the ALJ's statement is correct.

## VII.  <u>Evaluation of Symptoms</u>

### A.  **Legal Standards**

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[21] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical

---

[21] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[22]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

---

[22] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d at 1040).

B.    **Application**

Plaintiff argues that the ALJ failed to properly consider her subjective complaints. However, the ALJ did consider plaintiff's "symptoms" in accordance with SSR 16-3p. (T. 15-16). The ALJ reviewed plaintiff's function report, testimony, and statements made to her health care professionals regarding her symptoms and activities, with attention given to both physical and mental limitations. (T. 15-21). Plaintiff's allegations were inconsistent with Dr. Jenouri's statement that she was only "mildly limited" in her ability to walk, stand, sit for long periods, bend, climb stairs, lifting and carrying.

A review of the evidence of record supports the ALJ's findings. On July 27, 2016, plaintiff told her therapist that she drove her mother to Albany. (T. 796). At her administrative hearing, plaintiff testified that she did not drive much because it was hard for her to pick her foot up off the accelerator onto the brake. (T. 97). Plaintiff underwent physical therapy in 2016. On July 21, 2016, the physical therapist noted that

although plaintiff claimed pain all over her body, she was able to complete the exercises without pain, and felt better afterward. (T. 663). The therapist noted that plaintiff was "doing well" with the course of treatment, although she needed work on improving her technique and control. (T. 665). The court notes that on April 3, 2017, plaintiff was examined by gastroenterologist Abdulhadi Quadri for an intestinal problem. (T. 696-705). However, Dr. Quadri conducted a full physical examination. Plaintiff denied any joint pain, muscle spasms, or limitation in her range of motion. (T. 704). On examination, Dr. Quadri found no edema and a good range of motion in all joints, with no tenderness and normal motor function. (T. 704-705).

A review of FNP Rivenburgh's treatment notes also support the ALJ's finding that any mental limitations which are more limiting than the ALJ's determination are not "consistent" with the medical evidence. In September of 2016, plaintiff was assaulted by her brother. On September 6, 2016, FNP Rivenburgh stated that plaintiff's anxiety was worse after that event. (T. 727). However, FNP Rivenburgh stated that prior to the assault, her depression and anxiety were "well controlled," and that her cognition was within normal limits. (T. 728, 730-31). On October 6, 2016, plaintiff told FNP Rivenburgh that, although she was not sleeping well, she thought her depression was under control. (T. 733). On November 17, 2016, FNP Rivenburgh stated that plaintiff's mood was stable, she was not depressed, her anxiety was "well controlled," and she was sleeping better. (T. 744). Her physical and mental examination was essentially within normal limits, including no edema in her

extremities[23]. (T. 747-48).

On January 26, 2017, FNP Rivenburgh stated that plaintiff felt her anxiety was "a lot higher" because she started college, but her mood was stable, and she was not depressed. (T. 749). Plaintiff was sleeping well, most of her mental findings were within normal limits, and physically, she had no edema in her extremities. (T. 753). FNP Rivenburgh recommended daily exercise. (T. 754). In February and March of 2017, FNP Rivenburgh's findings were similar,[24] and on May 11, 2017, she reported that plaintiff's mood was stable, although plaintiff reported "low level" depression for the past two or three months. (T. 766). In June of 2017, plaintiff stated that her mood was up and down, but she was doing well in college. (T. 771). Plaintiff's mood was "depressed," but her thought content and cognition were within normal limits. (T. 775-76).

On September 5, 2017, plaintiff rated her depression "worse than last time." (T. 778). However, FNP Rivenburgh stated that plaintiff's "affect was not congruent with [her] report." (*Id.*) Plaintiff was unhappy with her routine, but she spoke "cheerfully" about her daughter starting school. (T. 778). Plaintiff had no side effects from her medications, she was sleeping well, and most of FNP Rivenburgh's findings were

---

[23] The court is specifically referencing edema because plaintiff alleges that she gets pain if she sits too long and her legs swell because of her history of DVT. The court also notes that plaintiff's last episode of DVT was in 2012. The court is not minimizing plaintiff's impairment. Rather this is mentioned in conjunction with the ALJ's determination regarding the extent of plaintiff's limitations and their consistency with the medical record.

[24] On February 27, 2017, plaintiff reported that her mood was stable, she was doing well in college, and sleeping well. (T. 755). Physical and mental examination was within normal limits. (T. 758-59). On March 30, 2017, the medical notes were very similar. (T. 760-64).

within normal limits, although plaintiff's insight was poor, and her affect was a little flat. (T. 782). Once again, physically, plaintiff exhibited no edema. (T. 782). FNP Rivenburgh stated that plaintiff's "bipolar" disorder was in "full remission." (T. 783).

On November 27, 2017, plaintiff told FNP Rivenburgh that her depression had improved and her anxiety stayed the same, with her moods going up and down. (T. 785). However, plaintiff stated that things were "stressful" because she was now the "care giver" for her "medically brittle mother."[25] (T. 784-85) On September 17, 2017, plaintiff told LCSW Schultz that she had an argument with her SSI attorney because plaintiff's primary care provider wrote a letter stating that plaintiff could sit for six hours, and it appeared that she could work, but that if plaintiff could get statements from "psychiatry," the attorney would have something to work with. (T. 816-17). Plaintiff also told her therapist that she dropped out of school because she did not think that she could be a teacher.[26] (T. 816). On November 30, 2017, plaintiff told her therapist, Malene Schultz that she was staying with her mother from 8 a.m. to 3 p.m. every day to care for her. (T. 823).

Plaintiff's statements to her providers, together with the medical evidence show that the ALJ's determination that the plaintiff's stated symptoms were not completely consistent with the evidence is supported by substantial evidence. It was the ALJ's responsibility to weigh the various opinions along with the other evidence and

---

[25] On October 18, 2017, plaintiff told her therapist that her mother had her leg amputated, and that plaintiff was helping her. (T. 818).

[26] Plaintiff testified that she was "kicked out" of school because she could not concentrate or sit long enough. (T. 98-99).

29

determine which of plaintiff's limitations were supported by the overall evidence of record. *See Bliss v. Colvin*, 2015 WL 457643, at *7.

## VIII. <u>Step Five Determination</u>

### A. <u>Legal Standards</u>

Once the plaintiff shows that he cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[27] are present or when exertional impairments do not fit

---

[27] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs

30

squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-521, 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp*, 802 F.2d at 605). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

### B. Application

Plaintiff argues that the ALJ erred in utilizing the Grids to determine that she was not disabled, and that her mental impairment imposed a "more than negligible" loss of work capacity, requiring the use of a vocational expert. This court does not agree. The ALJ specifically outlined the regulations regarding the use of the Grids. (T. 22). The

---

other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

ALJ then cited SSR 85-15, which provides that "so long as an individual can perform the basic mental demands of competitive, remunerative, unskilled work, the individual may be found to be 'not disabled.'" (*Id.*)

Plaintiff argues that ALJ Fein found that plaintiff had moderate limitations in concentrating, persisting, or maintaining pace, which would have more than a "negligible" effect on plaintiff's ability to work. (Pl.'s Br. at 21). The ALJ made this finding when he was determining whether plaintiff had a "listed" impairment at step three. (T. 14). The ALJ stated that after "reviewing the observations of Dr. Long, the counseling notes maintained by Ms. Schultz, and the statements made by the claimant . . . I find that the claimant has no limitation understanding, remembering, or applying information, and interacting with others. She has a moderate limitation concentrating, persisting or maintaining pace, and no limitation adapting or managing herself." (*Id.*)

At step five, the ALJ also noted that the "basic mental demands include the ability to understand, carry out and remember simple instructions; respond appropriately to supervision, coworkers and usual work situations; and deal with changes in a routine work setting." (T. 22) (citing SSR 85-15). He found that plaintiff had no significant limitations in the performance of these basic mental demands. (T. 22). The plaintiff had no limitations understanding, remembering, or applying information, and had no limitation in interacting with others, adapting, or managing herself. (T. 14). In *Zabala v. Astrue*, the Second Circuit affirmed an ALJ's decision not to use a vocational expert in a similar situation, when the ALJ made a finding that "Petitioner's mental condition did not limit her ability to perform unskilled work,

including carrying out simple instructions, dealing with work changes, and responding to supervision. Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical–Vocational Guidelines was permissible." 595 F.3d at 411. *See also Lebron v. Colvin*, No. 14-CV-5921, 2018 WL 3471815, at *1-3 (S.D.N.Y. July 18, 2018) (affirming the ALJ's use of the Grids, notwithstanding plaintiff's "mental/cognitive limitations" when plaintiff's limitations had little or no effect on the occupational base of unskilled work).

A review of the medical records in this case shows that the ALJ's decision was supported by substantial evidence. Although FNP Rivenburgh completed a very restrictive MSS, her progress notes indicate otherwise. Plaintiff consistently had normal attention and concentration (T. 640, 730, 747, 758), and her cognition was within normal limits (T. 731-32, 737, 753). In February 2017, her counselor stated that plaintiff was getting 100s on her quizzes and she was communicating better with her husband. (T. 807). Plaintiff told her counselor, in March 2017, that everything was going well, and she planned to join a gym. (T. 809). In April 2017, she told her counselor that she got an "honors certificate" for her online college work. (T. 810). While there are certainly other entries that show some mental limitations, the ALJ's determination that these limitations did not significantly diminish plaintiff's ability to perform unskilled work was supported by substantial evidence, and a vocational expert was not required.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case

**DISMISSED**, and it is

      **ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated:  April 13, 2020

Hon. Andrew T. Baxter
U.S. Magistrate Judge